IN RE INTEREST OF JUSTIN C. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
TIM C. AND PAM C., APPELLEES, V. LAURIE C., APPELLANT.
581 N.W. 2d 437

Filed June 23, 1998.    No. A-97-988.

Stuart B. Mills for appellant.

C. Matthew Samuelson, of Maul & Samuelson, for appellees.

John D. Feller, guardian ad litem for the children.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MILLER-LERMAN, Chief Judge.

Laurie C., the biological mother of Justin C., Sandra C., Ross C., and Jamie C., appeals an order of the Cuming County Court appointing Tim C. and Pam C. as the legal guardians of the four children. For the reasons set forth below, we dismiss the appeal and note that the county court's order purporting to appoint Tim and Pam as guardians is ineffective and is, therefore, vacated.

## FACTS

Laurie C. is the biological mother of the four above-named children. Laurie is divorced from Don C., the children's biological father, and Don no longer lives in Nebraska. Laurie was awarded custody of all four children when she and Don divorced, and the record suggests that Don's contact with the children since then has been minimal. Don has not appealed the county court's order appointing Tim and Pam as the children's legal guardians.

On October 26, 1993, a petition was filed in the county court sitting as a juvenile court, alleging that Justin, Sandra, Ross, and Jamie lacked proper parental care by virtue of Laurie's faults or habits. The petition specifically alleged that Laurie did not provide an adequate home for the children, that she failed to properly supervise them, and that Laurie was in jail as the result of three prior arrests for violating a protection order.

The same day, the juvenile court entered an order temporarily placing the children in the custody of the Department of

Social Services, now known as the Department of Health and Human Services. For clarity, we refer to the department as "DHHS" throughout this opinion, regardless of the date of events mentioned herein. A further first hearing was held December 10. Laurie was personally present at this hearing with court-appointed counsel, and she denied the allegations in the juvenile court petition.

DHHS placed the four children in foster care together in the home of their paternal uncle and aunt, Tim and Pam. Tim, Pam, and their children lived directly across the street from Laurie, and Laurie's four children had often eaten meals and stayed with Tim and Pam before the temporary order was entered by the juvenile court.

The juvenile court conducted an adjudication hearing on January 7, 1994. At the time of the adjudication hearing, Justin was approximately 14 years old, Sandra was 13, Ross was 10, and Jamie was 6. Laurie personally appeared at trial with her counsel. Don was not present, but he was represented by counsel. An attorney was appointed guardian ad litem for the children at some point prior to the adjudication hearing. This guardian ad litem actively participated in the adjudication hearing.

The evidence from the adjudication hearing included testimony and a written report from Dr. John Curran, a clinical psychologist who examined Laurie at the Norfolk Regional Center. Laurie submitted to the psychological assessment as part of an agreement with the prosecution in the criminal case pending against her. Dr. Curran believed that Laurie possessed low to average intelligence and that she had suffered from a delusional disorder for at least the past 6 months. Dr. Curran found that Laurie was obsessed with her former boyfriend, who had obtained a protection order to keep Laurie away from him. According to Dr. Curran, Laurie also believed that her sister was engaged in a conspiracy with Laurie's fellow workers and other townspeople to mimic or mock Laurie. Dr. Curran testified that Laurie's delusional disorder could result in her use of extremely poor judgment and in cognitive deterioration including deterioration of problem-solving and daily living skills like driving, food preparation, and adequate care of herself and her

children. Dr. Curran felt that Laurie's prognosis for short-term improvement without treatment was poor. He recommended in-patient psychiatric treatment and psychotropic medications for Laurie, but she denied that she suffered from a mental disorder, and she refused treatment. According to Dr. Curran, Laurie's response is not an uncommon one from persons suffering from delusional disorders.

Pam testified that after Laurie's children were placed with her by DHHS for foster care, they became calmer and happier. Pam arranged medical and dental examinations for the children, after which three of the four children were prescribed eye-glasses. The two eldest children, Justin and Sandra, also required extensive dental work.

Pam, as well as another of Laurie's neighbors, testified that prior to the placement of the children with Pam, Laurie's chil-dren frequently complained that they were hungry and had gone a day or more without food. Laurie's daughter Sandra verified that the children often went without proper meals and that at times they gave up their meals so that the oldest child, Justin, a diabetic, would have enough food to prevent an adverse reac-tion from his diabetes. Sandra testified that the family's house was sometimes clean and sometimes not. Sandra denied that Laurie had ever hit her or the other children.

Laurie also testified at the adjudication hearing, disputing all of Dr. Curran's testimony. She claimed that the criminal charges against her were resolved, and she denied that she was obsessed with her former boyfriend. Laurie also denied that she left her children unfed, unattended, or without proper supervision. Laurie claimed that unkempt conditions and an obvious scarcity of food, shown by photographic evidence, were atypical of the general condition of her household. Laurie asserted that her ex-husband's failure to make timely child support payments caused her family financial distress, but she denied that her home or parenting habits were so deficient that her children were with-out proper care.

Laurie's protestations notwithstanding, the juvenile court found the allegations in the petition to be true. In an order dated January 7, 1994, the juvenile court adjudged Laurie's children in need of assistance, through no fault of Laurie, pursuant to

Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993). The juvenile court continued the children's custody in DHHS, and the children remained in their foster care placement with Tim and Pam.

In a disposition order dated February 4, 1994, the juvenile court ordered Laurie to obtain mental health treatment. Case plans recommended by DHHS were apparently adopted by the court, although these plans are not in the record. The numerous orders from periodic review hearings indicate the court's continuing concern about Laurie's mental health. In a review hearing order dated April 25, 1995, the juvenile court ordered DHHS to provide an updated case plan, unless it filed a motion or petition to terminate Laurie's parental rights. This is the first reference in the record to potential termination of Laurie's parental rights.

At some point between April 25 and August 29, 1995, the State requested termination of Laurie's parental rights, and the court appointed a guardian ad litem for Laurie, in addition to her court-appointed counsel. Neither the State's petition for termination nor the order appointing a guardian ad litem for Laurie is in the record. We infer the occurrence of these events based upon orders in the record which note Laurie's appearance at a hearing with her counsel and her guardian ad litem, as well as an order dated November 15, 1995, resulting from an unfinished trial on the State's request to terminate Laurie's parental rights.

We cannot discern from the record if the basis claimed for termination was Laurie's neglect of her children, her mental illness manifested in the delusional thinking described by Dr. Curran, or another basis such as out-of-home placement. The record also fails to contain a complete bill of exceptions from the unfinished November 15, 1995, termination trial. The November 15 order entered in connection with these proceedings recites that Laurie, her counsel, and her guardian ad litem were present at trial, as well as counsel for the State; the guardian ad litem for Laurie's children; a DHHS representative; Tim and Pam, the foster parents; and Don C. and his counsel. The November 15 order states that after the State presented evidence to support termination of Laurie's parental rights, the State requested continuance of the trial, with the agreement of

all parties. The county court, sitting as a juvenile court, granted the continuance and noted that "[i]n the interim *all parties agreed* to the filing of a Guardianship for the juveniles, with Pam and Tim [C.] to serve as Guardians *with no restrictions* with the exception that Laurie [C.] could petition for and be allowed visitation with the children only under certain conditions[.]" (Emphasis supplied.) The November 15 order set forth conditions for Laurie's visitation, including her participation in mental health treatment and proof that the visits were in the children's best interests.

Nearly a year later, on October 21, 1996, Tim and Pam filed a petition in the same county court, not sitting as a juvenile court, for appointment as the children's legal guardians. The same county court judge who had presided over the juvenile court proceedings regarding termination of Laurie's parental rights conducted a hearing on the guardianship petition on November 13. Tim and Pam were present at the hearing with their counsel; Laurie appeared alone. The county court judge appointed Tim and Pam as guardians of Laurie's children without permitting Laurie to state her position on the guardianship. With the aid of her counsel from the juvenile court case, Laurie subsequently filed an objection to the guardianship in the probate court on November 18.

The court order which set Laurie's objection to the appointment of a guardian in the guardianship case for hearing on February 19, 1997, scheduled the hearing dually in the guardianship case as well as the juvenile case. At that hearing, Laurie claimed the consent she gave for the guardianship during the unfinished juvenile court termination trial in 1995 was ineffective because her consent was coerced by her court-appointed counsel and her guardian ad litem. Laurie further testified that although she was present at the first guardianship hearing in county court, she did not object to the county court's appointment of Tim and Pam as guardians because she had appeared without counsel, she had not had an opportunity to meaningfully consult with counsel, and she did not know she was allowed to object at the hearing.

Laurie's guardian ad litem from the juvenile court case testified as a witness in the hearing on February 19, 1997. He

asserted the attorney-client privilege to prevent his testimony regarding his conversations with Laurie, but the court ruled that the privilege did not apply. Laurie's guardian ad litem then testified that he did not coerce Laurie's consent to the guardianship and that he felt that the guardianship was in Laurie's best interests because of her agreement in the unfinished juvenile court termination case that if she consented to a guardianship, the State would not further pursue termination of Laurie's parental rights.

After this testimony, the children's guardian ad litem from the juvenile court case requested that Laurie's juvenile court guardian ad litem, who had just testified, should be appointed as Laurie's guardian ad litem in the guardianship case as well. Laurie's counsel did not object, and the judge granted the motion. The court also took "judicial notice" of all of the juvenile court and guardianship case files and evidence involving Laurie's four children. No counsel objected to the court's taking of "judicial notice" of these files, a matter about which we comment later in this opinion.

In a written order filed on May 22, 1997, in the guardianship case, the court appointed Tim and Pam as temporary guardians of Laurie's children, pending a hearing in which Laurie could cross-examine witnesses and present her own evidence regarding the guardianship. The record does not show that this order, or one substantially like it, was filed in the separate juvenile court case.

On August 20, 1997, the county court, hearing the guardianship case, convened another hearing regarding Tim and Pam's guardianship petition. Laurie was present with her counsel from the juvenile court case and her guardian ad litem. For the sake of completeness, we note that the same lawyer appeared on Laurie's behalf during the juvenile and guardianship proceedings, although the record does not indicate when this attorney was actually appointed to represent Laurie in the guardianship proceedings. Tim and Pam's counsel was present, the guardian ad litem appointed for the children in the juvenile court case was present, and the State's counsel also appeared. Before any evidence was adduced, the court announced that, with the agreement of all counsel, it would again take "judicial notice"

of all evidence previously adduced in the juvenile court and guardianship cases concerning Laurie's children. The extent of matters "judicially noticed" is not reflected in the record on appeal.

At the August 20, 1997, guardianship hearing, Laurie admitted that she did not complete the mental health treatment ordered by the juvenile court, because she did not feel she needed it. Laurie stated that she did not know what guardianship procedures were but that she believed the instant probate hearing was for "where my kid's [sic] home is going to be is how I understand it."

In a written statement, Don, the children's father, stated that he consented to the guardianship. Justin and Sandra, Laurie's two eldest children, testified that they desired the guardianship and that they wanted to live with Tim and Pam. Justin testified that Laurie had not visited the children for several years, even though they lived with Tim and Pam across the street from Laurie. A DHHS worker testified that Laurie was consistently uncooperative in the case plans adopted by the juvenile court. The worker felt that direct contact between Laurie and her children was unwise because Laurie "emotionally victimized" the children. This worker also testified that since Justin, Sandra, Ross, and Jamie were placed in foster care with Tim and Pam, the children had made good progress in almost every respect.

During this hearing, the trial judge had to repeatedly admonish Laurie to not interrupt and confront the witnesses. After she was threatened with contempt of court, Laurie's verbal outbursts abated.

In an order filed September 3, 1997, the county court, in the guardianship case, appointed Tim and Pam as permanent guardians of Laurie's children. The record does not indicate whether this order, or one like it, was filed in the separate juvenile court case. Laurie appeals.

## ASSIGNMENTS OF ERROR

Laurie asserts that the county court lacked jurisdiction to appoint Tim and Pam as legal guardians for Laurie's children and that if the county court had jurisdiction, the guardianship was unjustified because there was no evidence that Laurie's

parental rights were terminated or suspended by prior court orders, or prior or current circumstances.

## STANDARD OF REVIEW

A proceeding for appointment of a guardian in a probate matter is reviewed on appeal for error on the record. *In re Guardianship of Zyla*, 251 Neb. 163, 555 N.W.2d 768 (1996). On questions of law, an appellate court has an obligation to reach its own conclusions independent of those reached by the lower courts. *Id.*

## ANALYSIS

Laurie claims that the county court was without jurisdiction to appoint Tim and Pam as guardians of Laurie's four children in the guardianship case. We agree.

The case *In re Guardianship of Alice D. et al.*, 4 Neb. App. 726, 548 N.W.2d 18 (1996), provides guidance in analyzing this claim. There, a grandfather with the support of DHHS petitioned in county court for guardianship of his minor grandchildren, all of whom were subject to pending juvenile court proceedings. In prior juvenile court orders, legal custody of the children was awarded to DHHS, which placed the children in foster care with their grandfather. The children were doing well, and their mother and DHHS supported the grandfather's guardianship. However, the court refused to appoint the grandfather as the children's guardian, inter alia, for lack of notice to all parties. On appeal, this court dismissed the appeal for the reason that the court lacked jurisdiction and further noted that the court's orders therein were ineffective.

The concern expressed in *In re Guardianship of Alice D. et al.* about a county court's appointment of a guardian for children already in the legal custody of DHHS by virtue of prior juvenile court orders is on point with the case at bar. Neb. Rev. Stat. § 43-285(1) (Cum. Supp. 1996) indicates, in pertinent part, that when the court awards the care and custody of a juvenile to DHHS, "the juvenile *shall*, unless otherwise ordered, *become a ward and be subject to the guardianship of the department . . . to whose care he or she is committed.*" (Emphasis supplied.) Consistent with the reasoning set forth in *In re Guardianship of Alice D. et al.*, we hold that when custody of a child has been

awarded by a juvenile court to DHHS, appointment of a separate guardian for the child by a county court while the juvenile court case is proceeding creates a needless, perhaps harmful, procedure and the county court acquires no jurisdiction of the guardianship proceeding.

In connection with an analysis of the juvenile and probate statutes, this court stated in *In re Guardianship of Alice D. et al.*, 4 Neb. App. at 731, 548 N.W.2d at 22:

> If the juvenile court already has appointed a guardian, it is difficult to articulate a reason why the welfare and best interests of the minors would be served by the appointment of another guardian. If one considers the powers and duties that are placed upon a [probate] guardian of a minor by Neb. Rev. Stat. § 30-2613 (Reissue 1995), the powers and duties of the guardian appointed by the probate court would clearly conflict with the powers and duties of [DHHS] as guardian under juvenile court proceedings. . . .
>
> Even if the person or entity appointed guardian of a minor is the person or entity to whom the juvenile court has awarded custody, the situation is just as bad or worse because such persons or entities could be subject to supervision by two separate courts concerning their responsibilities.

In the case at bar, counsel for Tim and Pam requested not only that the county court make a guardianship appointment in the guardianship case but also that it order that the children "be terminated from the care, custody, and control of the [DHHS]." We opined in *In re Guardianship of Alice D. et al.* that "it seems clear that [DHHS] should not be allowed to use the probate court as a means of ignoring the juvenile court, and we are confident that the Legislature did not intend for the probate court to interfere with the juvenile court's work." 4 Neb. App. at 733, 548 N.W.2d at 23. Thus, we concluded in *In re Guardianship of Alice D. et al.*, that the county court did not have jurisdiction in a guardianship case to order a guardianship of the juveniles who were already wards of DHHS in a separate juvenile proceeding.

For the sake of completeness, we note that Tim and Pam and the guardian ad litem for the children in the case at bar argue on appeal that *In re Guardianship of Alice D. et al.* is distinguish-

able because in the instant case the same county judge presided over both the juvenile and guardianship cases, whereas in *In Re Guardianship of Alice D. et al.*, which arose in Lancaster County, there were two different judges involved, one from the separate juvenile court and one from the county court. The argument advanced is that the opportunity for confusion and inconsistent rulings from the two courts was greater in *In re Guardianship of Alice D. et al.* than in the present case. We do not agree.

We have recited the factual background of the instant case in detail above. Because we dismiss the appeal, we do not belabor the hazards engendered by proceeding in two actions at once, regardless of whether or not before the same trial judge. However, the record in the instant case demonstrates, inter alia, that the court in the guardianship case "judicially noticed" a body of proceedings from the juvenile case, the breadth of which is unknowable on appeal and which technique has been criticized, especially in juvenile cases. See, e.g., *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993); *In re Interest of L.H. et al.*, 241 Neb. 232, 487 N.W.2d 279 (1992); *In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 484 N.W.2d 68 (1992); *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992); *In re Interest of Tabitha J.*, 5 Neb. App. 609, 561 N.W.2d 252 (1997). Counsel serving as guardians ad litem were caused to perform several arguably inconsistent roles due to their appearances in both cases. See *Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998). See, also, Neb. Rev. Stat. § 43-272.01(2)(e) (Cum. Supp. 1996). The procedure which evolved in the guardianship case was confusing at best and lacked due process at worst. We find that *In re Guardianship of Alice D. et al.* is applicable to a case in which the same county judge hears both the juvenile and guardianship cases.

## CONCLUSION

We dismiss this cause for lack of jurisdiction, but we note that the order of the county court purporting to appoint Tim and Pam as guardians is ineffective and is hereby vacated.

APPEAL DISMISSED.