IN RE GUARDIANSHIP OF CAMERON D., A MINOR.
HOLLY S., APPELLANT, V. ROGER S.
AND NANCY S., APPELLEES.
706 N.W.2d 586

Filed December 6, 2005.    No. A-05-189.

John C. Jorgensen, of Legal Aid of Nebraska, for appellant.

John P. Heitz for appellees.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Holly S. appeals an order of the county court for Holt County, Nebraska, denying her petition for removal of coguardians of her child, Cameron D. She asserts that the court erred in finding that the coguardians had met their burden of proving by clear and convincing evidence that she is unfit to discharge her parental duties and in finding that it is in Cameron's best interests to continue the guardianship. The court based its determination on, inter alia, evidence of Holly's marital, educational, employment, and medical histories. Such evidence was insufficient to support the court's findings. We reverse, and remand with directions.

## II. BACKGROUND

Holly is the natural mother of Cameron, who was born December 30, 2000. Holly was a senior in high school at the

time of Cameron's birth. Holly and Cameron lived in the home of Holly's parents, Roger S. and Nancy S. Holly graduated from high school as salutatorian in May 2001. She attended college in Sioux City, Iowa, for one academic year while Cameron resided with Roger and Nancy.

Subsequently, Roger and Nancy filed a "Petition for Appointment of Guardian for a Minor" on June 19, 2002, requesting that the court name them as coguardians for Cameron. A corresponding affidavit was filed by Nancy. The petition asserted that an "emergency exist[ed]," that it was "not in the best interest of [Cameron] to be in the care and custody of [Holly]," and that "even temporary custody with [Holly] would be detrimental and not in the best interest of [Cameron]." According to the petition, the apparent "emergency" which ne- cessitated the appointment of guardians for Cameron was that Holly "ha[d] indicated her intention to remove [him] from the state of Nebraska." Nancy testified that the "initial reason" for the guardianship was that Holly "wanted to take [Cameron] to Sioux City" while she attended college. The record indicates that the court appointed Roger and Nancy as coguardians on August 26. Holly did not appeal this order, and we assume for the purpose of deciding this appeal that the guardianship was properly ordered.

During this guardianship, Holly maintained a relationship with Cameron. She attended college in Iowa and later in Lincoln, Nebraska. Holly came to Roger and Nancy's home "virtually every weekend" while she was attending college. In May 2004, Holly began living with her boyfriend, who is not Cameron's father, in a "[s]ubstantially furnished" three-bedroom apartment. She frequently visited Cameron at Roger and Nancy's home and had "taken him to her place for supper [and] had him overnight a few times." If Holly left work early, she would pick Cameron up from daycare, and she spent more time with him during times when she was unemployed. In addition, Holly and her boyfriend completed a parenting class.

Nearly 2 years after the guardianship was ordered, on July 6, 2004, Holly filed a petition with the county court, pursuant to Neb. Rev. Stat. § 30-2616 (Reissue 1995), to remove Roger and Nancy as coguardians of Cameron and to terminate the

guardianship. In the petition, Holly alleged that she "is a fit and proper person to resume her role as natural guardian of Cameron." A hearing on the petition was held on November 17, at which time Holly was 21 years old. Testimony was received from Jackie Fahrenholz, Cameron's daycare provider; Nancy; Cameron's father; and Holly.

Fahrenholz testified that she is a licensed home daycare provider and has provided daycare for Cameron since he was 6 weeks old. She testified as to the arrangements regarding who deposited Cameron at her house in the mornings and who retrieved him in the afternoons. Her testimony indicated that despite the guardianship of Cameron, Holly frequently picked Cameron up from daycare. Fahrenholz testified that on one occasion, Holly dropped Cameron off at Fahrenholz' home for daycare and allowed him to walk into the house on his own while Holly watched him from the car, as Nancy frequently did. Cameron entered the house through the unlocked front door, but unknown to Holly, no one was at home. Cameron was alone in the house for no more than 20 minutes and was unharmed.

In correspondence to the attorneys of record which was filed on December 30, 2004, the court noted that it was obligated to determine whether Holly was "not fit to take over [Cameron's] physical custody." In making that determination, the court considered that Holly "had numerous issues in her life" and examined Holly's educational, employment, relationship, and medical histories. Additionally, the court opined that "Cameron is comfortable and feels at home in [Roger and Nancy's] house." In its order, filed on January 13, 2005, the court denied Holly's petition and found that Roger and Nancy proved "by clear and convincing evidence that Holly . . . is, at this time, unfit to discharge her parental duties" and that "[i]t is in the best interests of Cameron . . . that the guardianship continue." This appeal followed.

### III. ASSIGNMENTS OF ERROR

Holly asserts that the county court erred in finding that (1) Roger and Nancy had proven by clear and convincing evidence that Holly is unfit to discharge her parental duties and (2) it is in Cameron's best interests that the guardianship continue.

## IV. STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 1995 & Cum. Supp. 2004), are reviewed for error on the record. *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings. See *In re Estate of Mecello*, 262 Neb. 493, 633 N.W.2d 892 (2001).

## V. ANALYSIS

Holly asserts that the court wrongly denied her petition based on her educational, employment, relationship, and medical histories. She argues that Roger and Nancy did not meet the burden of proving by clear and convincing evidence either that she is unfit or that she forfeited her right to custody. Additionally, she asserts that Roger and Nancy did not prove that it is in Cameron's best interests that the guardianship continue. We find merit in Holly's assignments of error and find that the court erred in denying Holly's petition. The record is insufficient to show that Holly is unfit to take physical custody of Cameron and that Cameron's best interests would be served by continuing the guardianship.

■ Our analyses of Holly's parental fitness and the best interests of Cameron are inseparable. It is well established that there are two competing principles in the area of child custody jurisprudence: the parental preference principle and the best interests of the child principle. See *In re Guardianship of D.J., supra.* Courts have long considered the best interests of the child to be of paramount concern in child custody disputes. See *id.* Yet, "the principle of parental preference provides that a court 'may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the [parent-child] relationship or has forfeited that right.'" *Id.* at 244, 682 N.W.2d

at 243, quoting *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996). See, also, § 30-2608(a) (expressing that parents are natural guardians of minor child when they are "competent to transact their own business and not otherwise unsuitable").

In weighing these two principles, the Nebraska Supreme Court has held that in guardianship termination proceedings involving a biological or adoptive parent, "the parental preference principle serves to establish a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent." *In re Guardianship of D.J.*, 268 Neb. at 244, 682 N.W.2d at 243. Under this principle, a parent has a natural right to the custody of his or her child which "trumps the interest of strangers to the parent-child relationship and the preferences of the child." *Id.* at 244, 682 N.W.2d at 243-44. Therefore, for a court to deny a parent the custody of his or her minor child, it must be affirmatively shown that such parent is unfit to perform parental duties or that he or she has forfeited that right. See *id.* Thus,

> an individual who opposes the termination of a guardianship bears the burden of proving *by clear and convincing evidence* that the biological or adoptive parent [either is] unfit or has forfeited his or her right to custody. Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent.

(Emphasis supplied.) *In re Guardianship of D.J.*, 268 Neb. 239, 249, 682 N.W.2d 238, 246 (2004).

In termination of guardianship proceedings, courts must be mindful of the temporary nature of guardianships that are created to relieve parents of the burdens of raising a child. One purpose of creating guardianships is to enable parents to "take those steps necessary to better their situation so they can resume custody of their child in the future." *Id.* at 248, 682 N.W.2d at 246. The policy behind this rule would be frustrated if guardianships were permanent or created a de facto termination of parental rights. See *id.* Parents in need of guardians for their minor children would be less likely to petition the court for the appointment of a guardian if such an appointment resulted in a

guardianship of unlimited duration. We address Holly's arguments below and, as mentioned above, find that her assignments of error have merit. In this case, our review for error on the record reveals that the decision of the county court is not supported by competent evidence.

### 1. EDUCATIONAL HISTORY

Holly argues that her educational history is not relevant to the determination of whether she is fit to resume custody of Cameron. She asserts that if she "had been to twenty different colleges and had been through twenty different programs of study, these facts are not relevant to whether she . . . is capable of carrying out any of the various parental duties and/or responsibilities." Brief for appellant at 21. Roger and Nancy assert that Holly's explanation of her educational history "reveal[s] her character. She is willing to make any argument necessary to try to get her way." Brief for appellees at 8. However, we find that Holly's argument has merit and supports her assertion that Roger and Nancy failed to meet their burden of proving that Holly is unfit to resume custody of Cameron.

As previously stated, Roger and Nancy must prove by clear and convincing evidence that Holly either is unfit or has forfeited her right to custody. See *In re Guardianship of D.J., supra.* Without such a showing, termination of the guardianship is proper and Cameron should be reunified with Holly. " 'Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.' " *Uhing v. Uhing,* 241 Neb. 368, 375, 488 N.W.2d 366, 372 (1992), quoting *Ritter v. Ritter,* 234 Neb. 203, 450 N.W.2d 204 (1990).

Testimony adduced at trial shows that Holly has attended three institutions of higher education, where she has achieved an excellent academic record. Holly attended college in Iowa from August 2001 to May 2002 and from August 2002 to February 2003. She received a scholarship and was a "pre med" major. Holly attended college in Lincoln, Nebraska, from August 2003 to May 2004. She had accumulated student loan debt from

attending the Iowa college and sought to take advantage of in-state tuition rates in Nebraska. Holly changed her focus from "pre med" to "pre nursing" because she "didn't want to leave Cameron behind" for the period of time it would require for her to complete medical school. She attended a community college at the time of the hearing in fall 2004, taking online courses in "Health Information Management," so that she "could come home [and] be close to Cameron." Holly testified that her cumulative grade point average for her completed coursework was approximately 3.8.

The court noted Nancy's testimony that Holly "seems unable to settle on any particular course of study." However, this evidence does not support a finding that Holly is unfit. Holly's educational history does not represent any " 'personal deficiency or incapacity' " that would be detrimental to Cameron's well-being. See *Uhing v. Uhing*, 241 Neb. at 375, 488 N.W.2d at 372. The evidence adduced at trial regarding Holly's educational history does not clearly and convincingly establish that Holly is unfit to resume parental responsibility of Cameron; nor does it rebut the presumption that it is in Cameron's best interests to be reunited with Holly. As such, Holly's assertion has merit.

### 2. EMPLOYMENT HISTORY

Holly argues that the evidence received at trial was insufficient to support the finding that she is an unfit parent by reason of her employment history or status. We find that the evidence of Holly's employment history is inadequate either to support the court's finding that Holly is unfit to take custody of Cameron or to rebut the presumption that it is in Cameron's best interests to be reunited with Holly.

On our review for error on the record, we must determine whether there was clear and convincing evidence that Holly is unfit or has forfeited her right to custody. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). See, also, *In re Guardianship of Rebecca B. et al.*, 260 Neb. 922, 621 N.W.2d 289 (2000) (comparing parental fitness standard applied in guardianship appointment under § 30-2608 with juvenile court's finding that it would be contrary to juvenile's health, safety, and welfare to return juvenile home).

Nancy testified as to Holly's employment history from the time of her high school graduation to the time of the hearing in the instant case. Holly's employment history consists of several part-time jobs at fast-food restaurants and clothing and grocery stores. In addition, she became a certified nurse's aide and has worked at several nursing homes. Holly testified that her part-time jobs were "temporary transitional positions" and not a part of her "life's work." She explained that she had a history of frequently changing jobs because she had often been in the position of having to choose between working at a "minimum wage job" and studying. At the time of the hearing, Holly was scheduled to begin working at a nursing home in Atkinson, Nebraska, as a certified nurse's aide at the rate of $8.52 an hour.

The evidence in the record regarding Holly's employment history does not support a finding that Holly is unfit to perform the duties imposed by her parental relationship. On the contrary, Holly is a licensed certified nurse's aide and has completed courses in the fields of sociology and psychology. Given these facts, the record does not justify the conclusion that Cameron's health, safety, or welfare would be compromised by returning him to Holly's home. Therefore, Holly's contention that her employment history does not support the court's finding that she is unfit has merit.

### 3. MARITAL STATUS

Holly asserts that "the evidence adduced at trial below lacks sufficient competency to support the finding of unfitness and is otherwise arbitrary, capricious and/or unreasonable." Brief for appellant at 13. She argues that a determination of parental fitness founded in part or whole upon her marital status is erroneous. Roger and Nancy argue that Holly's marital status creates uncertainty for Cameron and that they do not approve of Cameron's living with Holly while she cohabitates without the benefit of marriage. The court opined that "[t]here are indications that Holly's relationship with [her boyfriend] is not permanent. Holly contends that they are 'engaged' but I don't find that assertion compelling." We find that the evidence of Holly's relationship or marital status does not support a finding that Holly is unfit to perform the duties imposed by her parental relationship.

Of primary consideration in the instant case is whether there was clear and convincing evidence at trial that Holly is unfit. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). In looking at the issue of parental fitness, the court must consider whether Holly has a personal deficiency or incapacity that will be detrimental to Cameron, by preventing her from performing her parental obligations. See *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992).

While attending college in Iowa, Holly was in a relationship with a man which had terminated prior to the time of the hearing in the instant case. Nancy testified that during the course of the relationship, an abusive incident occurred against Holly that resulted in Holly's overdose on antidepressant pills. Holly remained hospitalized for 1½ days for psychiatric evaluation due to this incident. The evidence adduced at trial indicates that this was an isolated event and, furthermore as noted above, that the relationship has ceased. Given these facts, the abuse suffered by Holly and her subsequent overdose do not justify the conclusion that Cameron's well-being would be compromised by his returning to Holly's home.

After attending college for a year in Lincoln, Holly moved to O'Neill, Nebraska, in May 2004 and resided with her current boyfriend. There is no evidence on the record to show that he poses a threat to Cameron's safety. We understand that Roger and Nancy may have concerns about Holly's boyfriend, because Holly once had a volatile relationship with another man, but there is no evidence showing that Holly should be considered unfit to parent Cameron, given this relationship. Additionally, there is no evidence that the living arrangement would be detrimental to Cameron's best interests. In fact, Holly's boyfriend voluntarily took parenting classes with Holly. Therefore, we find merit to Holly's assertion that the court erred in determining that Holly is unfit by reason of her relationship or living arrangement.

### 4. MEDICAL HISTORY

Holly asserts that the court erred in finding her unfit based, in part, on her medical history. She argues that "[t]he medical issues raised at trial are insufficient to demonstrate unfitness

and were merely utilized as a guise for bypassing the parental preference principle and instead applying a best interests of the child rationale." Brief for appellant at 19. Roger and Nancy maintain that Holly's medical condition essentially creates an unsafe and unstable environment for Cameron and that her condition will affect Cameron's well-being, as he depends on her for his care and safety. The court noted that "Holly takes medication for anxiety and depression" and that Holly "has seen several doctors . . . and has an appointment with a neurologist." We find that Holly's argument has merit. The evidence of Holly's medical history does not clearly and convincingly establish that she is unfit or that her condition will prevent her from performing her parental obligations, resulting in detriment to Cameron's well-being.

As previously stated, clear and convincing evidence is mandatory to establish that Holly is unfit to resume the obligations imposed by the parent-child relationship. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). Whether Holly is unfit is a determination made based on an examination of personal deficiency or incapacity that would result in detriment to Cameron's well-being. See *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992).

Nancy testified at trial that Holly received counseling services from the time she was 14 years old, both before and after being sexually assaulted by a 14-year-old boy. According to Nancy, the original cause for seeking these services was that Holly "was getting to be out of control [with t]emper tantrums." Nancy indicated that Holly had been in counseling and had been receiving psychiatric evaluations since that time, and that Holly had been referred to different counselors. Nancy testified that Holly "was having trouble with . . . depression type things" and had been prescribed antidepressants. Also, Nancy testified that Holly received counseling while attending college in Nebraska, because "she was having trouble with school and her finances and things like that." Based on the results of one psychological evaluation, Nancy testified that to her knowledge, Holly was diagnosed as "bipolar."

Testimony by Nancy and Holly describes one incident where it appears that Holly may have had some type of seizure while

driving with Cameron. Holly pulled over, stopped the car, and telephoned Roger and Nancy. She was able to describe her surroundings to them, and they located Holly and Cameron and returned them home. Additionally, Holly has had two other episodes where she had "what appeared to be like heat stroke," but may have been "some type of seizures." Based on these incidents, a neurologist performed an electroencephalogram test on Holly and further recommended that Holly not operate a motor vehicle pending the results of that test. Holly complied with this recommendation and made alternate arrangements for transportation.

We note that the record is lacking testimony from any expert witness able to provide a medical opinion regarding Holly's condition. However, based on the testimony adduced at trial, there is a lack of sufficient evidence to buttress the court's finding that Holly's condition makes her unfit, and the evidence adduced certainly does not rebut the presumption that reunification with Holly is in Cameron's best interests. Holly's condition does not rise to the level of parental unfitness where her incapacity would prevent " 'performance of a reasonable parental obligation in child rearing and . . . has caused, or probably will result in, detriment to [Cameron's] well-being.' " See *Uhing v. Uhing*, 241 Neb. at 375, 488 N.W.2d at 372. As such, we find merit to Holly's argument.

### 5. RESOLUTION

From our review for error on the record, we conclude that the evidence, examined separately and cumulatively, is insufficient to establish Holly's unfitness to perform the duties imposed by the parent-child relationship and that therefore, the evidence fails to show that Holly is unfit to have custody of Cameron. Holly argued that her educational, employment, relationship, and medical histories were insufficient to support the court's finding that she is unfit. We find merit with each of her arguments and, as such, find merit with her assignments of error.

Although, as the court noted, "Cameron is comfortable and feels at home in [Roger and Nancy's] house," and although at the time of the trial proceedings, Cameron might have enjoyed some economic advantages from continued presence in Roger and

Nancy's residence, neither of those circumstances justifies a denial of Holly's application. The parental preference principle dictates that in order to deny Holly's petition, the court must find either that Holly is unfit or that she forfeited her right to perform the duties imposed by the parent-child relationship. The principle establishes a rebuttable presumption that Cameron's best interests are served by reuniting him with Holly. We find that there was insufficient evidence to support the court's finding that Holly is unfit or to rebut the presumption that Cameron's best interests would be served by his reunification with Holly.

## VI. CONCLUSION

We reverse the order denying Holly's petition to terminate the guardianship and remand the case with directions to terminate the guardianship and to reinstate in Holly the care, custody, and control of Cameron.

REVERSED AND REMANDED WITH DIRECTIONS.